Pyramid Coal Corporation, a Corporation v. Commissioner.
Pyramid Coal Corp. v. Commissioner
Docket No. 108767.
United States Tax Court
1943 Tax Ct. Memo LEXIS 530; 1 T.C.M. (CCH) 367; T.C.M. (RIA) 41232; January 2, 1943
*530 E. B. WILKINSON, ESQ., 231 S. LA SALLE ST., CHICAGO, ILL., FOR THE PETITIONER, JOHN D. KILEY, ESQ., FOR THE RESPONDENT. LEECH Memorandum Findings of Fact and Opinion LEECH, Judge: The respondent determined deficiencies in unjust enrichment tax against petitioner of $8,416.91 for the fiscal year ending March 31, 1936, and $1,755.93 for that of 1937. He also added $438.98 to the deficiency for the latter year because of petitioner's failure to file a return for that year. The issues are whether petitioner shifted the burden imposed on it by the Bituminous Coal Conservation Act of 1935 and the propriety of the addition to the tax. Findings of Fact The petitioner is an Illinois corporation. It filed an unjust enrichment tax return for the fiscal year ending March 31, 1936 with the collector of internal revenue for the First District of Illinois. It failed to file a return for the 1937 fiscal year. The petitioner is engaged in coal mining operations. It was formed in 1928 as a result of the consolidation of the Pyramid Coal Company and the Binkley Company. It operated a single mine called the Pyramid mine until January 1, 1935. On that date the Coal Stripping Company was merged with *531 it and it thereby acquired leases to the Danville and Pyott mines. It thereafter operated all three mines. The coal mined by petitioner was sold on the "spot" market and under short and long-term contracts. The coal sold on the "spot" market and under the short-term contracts were handled by the Binkley Coal Company (hereinafter called "Binkley") which acted as petitioner's exclusive sales agent. Binkley acted as sales agent for several coal companies. The long-term contracts were with the Missouri Pacific Railroad, the Chicago Great Western Railroad, the Terminal Railroad Association of St. Louis, and the Universal Coal Washing Company. The Missouri Pacific contract provided for the purchase of between 4,000,000 and 6,000,000 tons of coal per year to be delivered in nearly equal monthly installments. The Chicago Great Western contract provided for the purchase of between 1,100 and 1,600 tons per day. The contracts with these two railroads provide definite purchase prices for the coal which may be varied for changes in labor costs. These changes may be determined by the parties and, if they can not agree, the matter is to be submitted to arbitration. This is the only change in price *532 which these contracts permit. The contract with the Terminal Railroad also provides for a change in purchase price for a change in labor costs. The contracts with the Missouri Pacific and Chicago Great Western Railroads were entered into prior to 1931. The contract with the Terminal Railroad was entered into in the latter part of 1934. No shipments were made under it, however, until the latter part of June 1935. Petitioner had contracts as early as 1935 which contained clauses providing for a change of the purchase price of the coal if a tax was imposed. Although Binkley fixed the selling prices of coal sold by petitioner in all sales other than those under the long-term contracts, they were controlled by competition. Binkley knew of the impending imposition of the Guffey tax from 30 to 60 days before its effective date, November 1, 1935. The petitioner was a member of the Illinois Coal Operators Association. The wages paid by petitioner to its workers were in accord with a contract between that association and the United Mine Workers of America. On October 1, 1935 a new contract between that association and the United Mine Workers of America went into effect. It provided for substantial *533 wage increases and petitioner complied therewith. On that date, the sales prices of coal sold under contract to the three railroads were increased to figures at which they remained during the taxable periods. The sales prices per ton to the three railroads before and after October 31, 1935 were as follows: Prior to
After
October
that
1, 1935
date
Missouri Pacific
$1.385
$1.435
Terminal Railroad
1.50
1.55
Chicago Great Western
1.35
1.40
Petitioner also negotiated with the Universal Coal Washing Company for an increase of contract prices. On March 1, 1936, an increase of four cents per ton became effective, thus raising the price from $.65 to $.69 per ton. The Bituminous Coal Conservation Act of 1935 (hereinafter called the "Guffey Act") went into effect on November 1, 1935. Under its terms, petitioner became liable to a tax of 1 1/2 per cent on its net sales. Binkley sought to pass the amount of this tax on to the petitioner's vendees. It tried to do this for all of its clients. It, therefore, added the tax on the invoices which it sent out to purchasers. It was forced to drop this procedure after about ten days, however, because it found that the competitors *534 were not doing likewise. It, therefore, made adjustments to vendees where invoices had been sent containing the tax and it did not thereafter add the tax as a separate item. Customers were advised that they would not be charged for the tax. The petitioner also sought to collect this tax from the three railroads with which it had long-term contracts. All, however, refused to pay the tax on the ground that their contracts did not provide for a price change because of the imposition of a tax. It sent the Missouri Pacific an invoice for $829.54 covering the tax on the sales to it for the month of November. The railroad refused to pay it and petitioner credited the Missouri Pacific account for the amount of the tax on December 31, 1935. The tax to the Chicago Great Western was entered as an account receivable on Binkley's books from November 1935 through April 1936. A credit of $2,734.84 for the amount of the tax was entered on Binkley's books on May 27, 1936. The Terminal Railroad was billed for the amount of the tax from November 1935 through March 1936. On March 31, 1936 a credit was entered to Terminal for the amount of the tax, of $1,225.74. The petitioner sold during the fiscal *535 year ending March 31, 1936 a total of 1,257,812.8 tons of coal. Of this amount, 655,241 tons were sold under the long-term contracts to the railroads and 243,728.9 tons were sold under the contract to the Universal Coal Washing Company. The remainder of 355,842.18 tons was sold by the Binkley Coal Company. Most of the coal sold to the railroads came from the Pyramid mine, although some came from the Pyott mine. None came from the Danville mine. During the period from April 1 to May 18, 1936, the petitioner sold 31,606.6 tons of coal to the Missouri Pacific Railroad; 29,294.7 tons to the Chicago Great Western, and 7,641 tons to the Terminal Railroad. In addition, it sold 28,957.6 tons to the Universal Coal Washing Company. Coals from the Pyramid and Pyott mines are in the same classification. They were both used to fill the same long-term, short-term and "spot" contracts. Coal from the Danville mine had a lower b.t.u. content than that from those mines, and was classified differently. All of it was used on the short-term and "spot" contracts. It regularly sold at a higher price per ton than coal from the other mines because the mine was so located that its coal could be sold on a *536 local or "peddler" market for domestic consumers. The average selling price of coal from the three mines operated by petitioner during the period January 1 to October 31, 1936 was as follows: Pyramid, $1.1816 per ton; Pyott, $1.2645 per ton; and Danville, $1.4812 per ton. During the period November 1, 1935 through March 31, 1936 the average price of coal at the Danville mine was $1.65 per ton. The selling price of coal in the midwestern area customarily advanced during the winter months, however. The following table covers operations of the Pyramid mine alone for the fiscal years 1930-1935 and the same for the fiscal year 1936: Total
Year Ended March 31
Amount
Per Ton
TONS
6,056,998
Sales
$7,202,147.28
$1.1891
Less Operating labor & supplies
3,669,063.67
.6058
3,533,083.61
.5833
Less Fixed Charges
1,229,503.93
.2030
2,303,579.68
.3803
Less General Operating expenses
391,509.05
.0646
1,912,070.63
.3157
Less Administrative expenses
541,597.67
.0894
Profit
$1,370,472.96
$ .2263
1936
Year Ended March 31
Amount
Per Ton
TONS
911,700
Sales
$1,094,379.94
$1.2004
Less Operating labor & supplies
520,886.77
.5713
Less Fixed Charges
573,493.17
.6291
193,798.62
.2126
379,694.55
.4165
Less General Operating expenses
87,293.58
.0958
292,400.97
.3207
Less Administrative expenses
88,428.63
.0970
Profit
$203,972.34
.2237
*537 The following table covers operations of the Pyramid mine for the months from November 1 to March 31 in the fiscal years 1930-1935 and for the same period in the fiscal year 1936: Total
Five Months Ending March 31
Amount
Per Ton
TONS
2,716,844
Sales
$3,259,692.71
$1.1998
Less Operating labor & supplies
1,597,231.61
.5879
1,662,461.10
.6119
Less Fixed charges
548,936.63
.2020
1,113,524.47
.4099
Less General operating expenses
167,072.13
.0615
946,452.34
.3484
Less Administrative expenses
239,310.47
.0881
Profit
$ 707,141.87
$ .2603
1936
Five Months Ending March 31
Amount
Per Ton
TONS
442.254
Sales
$ 538,155.46
$1.2169
Less Operating labor & supplies
263,556.41
.5960
274,599.05
.6209
Less Fixed charges
102,587.50
.2319
172,011.55
.3890
Less General operating expenses
41,737.01
.0944
130,274.54
.2946
Less Administrative expenses
42,438.92
.0960
Profit
$ 87,835.62
$ .1986
The following table covers the operations of the Pyramid mine for the months from April 1 to October 31 in the fiscal years 1930-1935 and for the same period in the fiscal year 1936: Total
Seven Months Ended October 31
Amount
Per Ton
TONS
3,340,154
Sales
$3,942,454.57
$1.1803
Less Operating labor & supplies
2,071,832.06
.6202
1,870,622.51
.5601
Less Fixed charges
680,567.30
.2038
1,190,055.21
.3563
Less General operating expenses
224,436.92
.0672
965,618.29
.2891
Less Administrative expenses
302,287.20
.0905
Profit
$ 663,331.09
$ .1986
*538 1936
Seven Months Ended October 31
Amount
Per Ton
TONS
469,446
Sales
$ 556,224.48
$1.1849
Less Operating labor & supplies
257,330.36
.5482
298,894,12
.6367
Less Fixed charges
91,211.12
.1943
207,683.00
.4424
Less General operating expenses
45,556.57
.0970
162,126.83
.3454
Less Administrative expenses
45,289.71
.0980
Profit
$ 116,136.72
$ .2474
The following table contains the total sales, tons, and average realization per ton for the months of April and May in the fiscal year ending March 31, 1936, and totals for those months in the fiscal years 1931 through 1936: 1936
Total
Sales
$171,758.02
$1,071,538.47
Tons
146,532
905,836
Average realiza-
tion per ton.
1.1722
1.1829
The Pyramid and Pyott mines produced 454,678 tons of coal from April 1 to September 30, 1935. The cost of labor used in producing this coal would have been increased $.04901 per ton had the wage scale of October 1, 1935 been in effect during this period. The petitioner filed an unjust enrichment tax return, Form 945, for the fiscal year ending March 31, 1936, under which it elected to use Method I as set forth in section 501 (e) (1) *539 of the Revenue Act of 1936 for determining the extent to which the excise tax was shifted. Its return for that year showed no tax due. It failed to file a return for the following year. Respondent made a determination that tax was due for both years. The respondent's computation of the average margin for the six years preceding the imposition of the excise tax (section 501 (f) (1)), together with the computation of the aggregate average margin for each of the taxable years (Schedule I) is as follows: 1936
1937
1. Name of Commodity
Coal
Coal
2. Units in which sold
6,191,534
6,191,534
3. Aggregate selling price of articles reported on line 2 for
six (6) prior years
$7,372,651.62
$7,372,651.62
4. Aggregate cost of articles reported on line 2
$154,280.16
$154,280.16
5. Margin (line 3 minus line 4)
$7,218,371.46
$17,218,371.46
6. Average margin, per unit (line 5 divided by units re-
ported on line 2
$1.1658454
$1.1658454
7. Units sold during the taxable year for which the com-
putation is being made
656,065
154,557
8. Aggregate average margin (line 6 multiplied by line 7)
$764,870.36
$180,189.57
The extent of the shift of the burden of the excise *540 tax (section 501 (e) (1)) for each of the taxable years (Schedule C-I) was computed by respondent as follows: 1936
1937
1. Name of Commodity
Coal
Coal
2. Selling price of articles with respect to which each Fed-
eral excise tax was imposed but not paid
$846,984.79
$195,428.68
3. Cost of materials entering into the articles
$34,570.33
$6,439.60
4. Aggregate average margin as computed in Schedule I,
with respect to the quantity of articles reported in
line 2
$764,870.36
$180,189.57
5. Total of lines 3 and 4
$799,440.69
$186,629.17
6. Net income presumed to be attributable to shifting to
others the burdens of each Federal excise tax (line 2
minus line 5)
$47,554.10
$8,799.51
7. Amount of each Federal excise tax imposed with respect
to the articles (less reimbursement to purchasers and
increase in each tax under sec. 602 of the Revenue Act
of 1932)
$12,704.77
$2,931.43
8. Net income presumed to be extent to which the burden
of each Federal excise tax was shifted to others (line 6
or 7 for each column, whichever is the lesser)
$12,704.77
$2,931.43
The petitioner shifted $6,059.71 ($12,704.77 less $6645.06) of the Guffey tax in its 1936 fiscal year *541 and all of it in that of 1937. Opinion The respondent determined deficiencies in unjust enrichment tax against petitioner for the fiscal years ending March 31, 1936 and 1937, under section 501 (a) (1) of the Revenue Act of 1936. That section provides, in part, that a tax shall be imposed upon the income derived "from the sale of articles with respect to which a Federal excise tax was imposed * * * but not paid which is attributable to shifting to others to any extent the burden of such Federal excise tax * * *". Petitioner was liable for the Guffey coal tax from November 1, 1935 to March 31, 1936 and until May 18, 1936 when it was declared unconstitutional in . Section 501 (e) (1) [1] provides that if the taxpayer's margins during the tax period were larger than the average for the six years preceding the imposition of the tax, the tax is presumed to have been shifted.
*542 Petitioner argues (1) that no presumption that the tax was shifted existed here and (2) that if it did exist, the evidence rebutted it. In support of its first position, it is argued that respondent erred in his computation of "cost" under section 501 (e), because petitioner's depletion and royalty payments only were included. Petitioner contends that "cost" includes more than those two items, and means "the cost of the salable articles, i.e., the coal ready for shipment". The statute itself, however, disposes conclusively of this contention. "Cost" as used throughout section 501 is defined in subsection (f) (2) of that section as "* * * in the case of articles manufactured or produced by the taxpayer, the cost to the taxpayer of materials entering into the articles; * * *". Respondent was right. ; ; Tennessee, (on appeal, C.C.A. 6th Cir. * ). Next, petitioner argues that *543 respondent was wrong in computing the average margin upon the six preceding full years rather than the same months in those years in which the Guffey tax was in effect. The basis of this position is that the use of coal is somewhat seasonal and that the selling price is generally higher during the winter months when its use is increased, thus increasing the margin for those months. It is also said that since the petitioner sold none of the higher-priced coal from the Pyott and Danville mines during the base period, respondent should not have deducted the "average margin" based only upon Pyramid coal, from the increased selling prices of the taxable period which included the coal produced from the Pyott and Danville mines. The effect of both of these contentions may be, as petitioner insists, to increase the margin in the tax periods over the average for the base years. We believe, however, that the explicit wording of the statute prohibits any other meaning than that ascribed to it by respondent in his computation. Section 501 (f) defines the term "average margin", in part, as follows: * * * the term "average margin" means the average difference between the selling price and the *544 cost of similar articles sold by the taxpayer during his six taxable years preceding the initial imposition of the Federal excise tax * * *. The base period to be used in the computation of "average margin" is there specifically required to be the taxpayer's "six taxable years preceding the initial imposition of the Federal excise tax" - not portions of any or all of those years. Moreover, the quoted section does not require that the computation of the "average margin" shall be based on identical articles sold by the taxpayer during the base period. The requirement is "similar articles" only. Regulations 95, article 1 (j) (1), quoted with approval in , defined "similar article" as an article which resembles in all respects another article, or, if the taxpayer had no articles resembling in all respects such other article, the similar article is one which most nearly resembles such other article in all material respects (such as quality, weight, size, content, and use). This record discloses that coals from the Pyramid and Pyott mines had the same classification. The Danville mine, it is true, had a lower b.t.u. content *545 and was classified differently. But it is not disclosed how great a variation, if any, existed in the quality of the Danville coal as compared with that from the other two mines. The Danville coal was all used to fill the short-term and "spot" contracts, including those on the local market for domestic consumption. But there is nothing here establishing that the general use to which the coal from any one of these mines was put differed from that of the others. We think petitioner has failed to show that the coal produced from the Pyramid mine was not a "similar article" to that produced from the Pyott and Danville mines, under the quoted regulation. We thus conclude that under section 501 (e) (1) the presumption supporting the tax existed. Has petitioner successfully rebutted this presumption? Section 501 (i) suggests a method of rebuttal but it is not exclusive. Petitioner may prove by other relevant evidence that it in fact absorbed the tax. . The evidence is that petitioner invoiced the Guffey tax separately on both its "spot" market and contract sales. *546 Most of the purchasers refused to pay the invoices at all and the tax was returned to those who did pay it. The fact, however, is by no means conclusive that the tax was not shifted. Cf. . All sales except those involved under long-term contracts were made on a competitive market. That competition largely fixed those prices and might well have included the tax as a factor. It is not to be presumed that petitioner's competitors did not know of the impending tax and passed it on to the consumer. Certainly petitioner knew of it from 30 to 60 days before the date of its imposition. We think petitioner has failed to rebut the presumption supporting the tax on all the coal it sold except under the longterm contracts. The proof as to the latter contracts is stronger for petitioner. But it, too, is not sufficient to rebut the presumption that the entire tax thereon was shifted. The prices fixed by three of these contracts were increased on October 1, 1935 when a wage increase took place, and were not thereafter changed. The *547 purchase price named in the contract with the Universal Coal Washing Company was raised a few months later after negotiations between the contracting parties. This situation is similar to that in , where the tax was found to have been absorbed. But the proof there showed that the prices of all grades of the taxpayer's coal were increased before the tax was imposed by an amount less per ton than the wage increase added to the cost per ton. Here all we have is the estimated effect of the wage increase per ton on the coal produced from the Pyramid mine. This was based upon the actual production of the mine for a time preceding the tax period. The actual fact of the effect of the increase of wages during the tax period is not disclosed nor is this failure in any way explained. The increase in sales price under these contracts could have included more than the increased labor costs. Cf. We do, however, have proof as to the effect of this and other increases in the cost of production of the Pyramid mine for the fiscal year ending March 31, 1936, although not *548 for that ending in 1937. In our judgment, therefore, an allocation may be made for the earlier year similar to that used in . Cf. . In the Stockton case, selling prices and costs of a full year were compared with averages of full years of the base period. But in that case the tax was in effect for the full taxable year whereas here it went into effect on November 1, 1935. Petitioner's fiscal years ended on March 31 so that the tax was in effect only five months out of the first taxable year. Thus we think that a comparison should be made of the period from November 1 to March 31 of the first taxable year with a like period in the base years. The selling price per ton of coal during the five months of this taxable year was $.0171 per ton higher than the average of those months in the base period. The costs of production were $.0788 per ton higher. The Guffey tax on coal produced at the Pyramid mine during these taxable months was $8,072.33 (1 1/2 per cent of net sales of $538,155.46) or $.01825 per ton. We think, therefore, that $.0788/.09705 *549 of $.0171 or $.01388 is the proportion of the increased sales price allocable to increased costs of production and not to the Guffey tax, while .01825/.09705 of $.0171 or $.00322 is the amount of the increased sales price per ton which was the Guffey tax and was thus shifted. Therefore, we think that .00322/.01825 of $8,072.33 or $1,424.27 was the amount of the tax allocable to the Pyramid mine which was shifted. The balance of $6,645.06 was absorbed by petitioner. The petitioner failed to file an unjust enrichment tax return for the 1937 fiscal year. Section 503 (a) of the Revenue Act of 1936 provides that "All provisions of law (including penalties) applicable with respect to taxes imposed by Title I" shall be applicable to the unjust enrichment taxes. Respondent was right in adding to the deficiency for 1937 an amount equal to 25 per cent thereof for that year for failure to file a return in that year. Decision will be entered under Rule 50.
Footnotes
1. SEC. 501. TAX ON NET INCOME FROM CERTAIN SOURCES (e) For the purpose of subsection (a) (1), (2), and (3), the extent to which the taxpayer shifted to others the burden of a Federal excise tax shall be presumed to be an amount computed as follows: (1) From the selling price of the articles there shall be deducted the sum of (A) the cost of such articles plus (B) the average margin with respect to the quantity involved; * * *.↩
*. B.T.A. decision reversed and remanded by C.C.A. 6, .↩